## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| C. MARK WHITEHEAD III; THE WHITEHEAD LAW FIRM, LLC; and GOFORTH LEWIS & SANFORD LLP | : : : : | Civil Action No. 17-4704 (SRC) |
| Plaintiffs, | : : : | **OPINION** |
| v. | : : | |
| STULL, STULL & BRODY | : : | |
| Defendant. | : : | |

**CHESLER**, District Judge

This matter comes before the Court on the motion for summary judgment filed by Defendant Stull, Stull, and Brody ("Defendant" or "SSB"), seeking an Order granting summary judgment and dismissing Plaintiffs' Complaint with prejudice, pursuant to Federal Rule of Civil Procedure 56. Plaintiffs C. Mark Whitehead III, Esq. ("Whitehead"), the Whitehead Law Firm, LLC ("Whitehead LLC"), and Goforth Lewis & Sanford LLP ("GLS"), (collectively, "Plaintiffs"), oppose this motion.[1] The Court heard oral argument on this motion on November 14, 2018. For the reasons that follow, Defendant's motion for summary judgment will be granted.

---

[1] Although represented by separate counsel, Plaintiffs filed their opposition to the motion jointly.

# I.    FACTUAL BACKGROUND

## A.    THE UNDERLYING VIOXX LITIGATION

This case arises out of a breach of contract action on a dispute over referral fees related to the Vioxx Class Action MDL,[2] wherein Plaintiffs seek to recover a portion of the attorneys' fees awarded to SSB. Whitehead is a citizen and resident of Louisiana, and Whitehead LLC is a limited liability company formed under the laws of the State of Louisiana. GLS is a limited liability partnership formed under the laws of the State of Texas. SSB is a partnership formed under the laws of New York. Jules Brody is a citizen of the State of New York. The facts germane to this motion for summary judgment are as follows:

On November 6, 2003, Whitehead and GLS filed a federal securities class-action lawsuit captioned Pringle, v. Merck & Co., Inc., et al., Case No. 03-3125, in the United States District Court for the Eastern District of Louisiana, (the "Pringle Action"). Def. Local Civ. R. 56.1 Statement of Undisputed Material Facts, Aug. 28, 2018, ECF No. 50 ("Def. SUMF"), ¶ 1. Shortly thereafter, Plaintiffs enlisted the aid of Jules Brody ("Brody"), principal partner of SSB. Id. ¶ 2. The Pringle Case was then consolidated with a related matter captioned Ravinitsky v. Merck, Case No. 04-147, in the United States District Court for the Eastern District of Louisiana. In February 2004, the Court appointed Richard Reynolds, Steven LeVan, Jerome Haber, and Marc Nathanson as Co-Lead Plaintiffs. The Court also approved SSB and Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg")[3] as Co-Lead Counsel. Id. ¶ 6. In February 2005, by

---

[2] "Vioxx Class Action MDL" refers to the matter captioned In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation, MDL No. 1659, Civ Action No. 05-1151, No. 05-2367 (D.N.J.).

[3] At the time the Vioxx Class Action MDL began, the firm was called Milberg Weiss Bershad Hynes & Lerach, LLP. The firm later became Milberg LLP. The Court will refer to the firm as "Milberg" throughout this Opinion.

Order of the Judicial Panel on Multidistrict Litigation, the consolidated Pringle Action was transferred to and made part of the Vioxx Class Action MDL pending in the District of New Jersey. Id. ¶ 7. On April 6, 2005, this Court entered an Order confirming the appointment of Richard Reynolds, Steven LeVan, Jerome Haber, and Marc Nathanson as Lead Plaintiffs. See Civil Action No. 05-1151, ECF No. 33. The Order also confirmed Milberg and SSB as Co-Lead Counsel. Id.

Representatives of each of the Plaintiffs in the Vioxx Class Action MDL sought admission *pro hac vice*. Attorney Jules Brody, of SSB, was admitted *pro hac vice* by Order dated April 11, 2005. See Civil Action No. 05-1151, ECF No. 38. Plaintiff Sanford, representing GLS, was admitted *pro hac vice* by Order dated July 5, 2005; Plaintiff Whitehead was admitted *pro hac vice* by Order dated August 5, 2005.[4] Pursuant these Orders, Plaintiffs were required to be bound by the Rules of the United States District Court for the District of New Jersey, including, but not limited to the provisions of L. Civ. R. 103.1, Judicial Ethics and Professional Responsibility;[5] and L. Civ. R. 104.1, Discipline of Attorneys. These Orders further provided that Plaintiffs Sanford and Whitehead "shall be deemed to have agreed to take no fee in any tort case in excess of the New Jersey State Court Contingency Fee Rule, Rule 1:21-7, as amended." Civil Action No. 05-1151, ECF Nos. 115 and 119.

Early in 2007, the Court granted the substitution of The Public Employees' Retirement System of Mississippi ("PERSM") as Co-Lead Plaintiff in place of Marc Nathanson, and granted

---

[4] See Civil Action No. 05-1151, ECF Nos. 115 and 119, respectively.

[5] L. Civ. R. 103.1 ("Judicial Ethics and Professional Responsibility") provides, in pertinent part:

> (a) The Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar admitted to practice in this Court, subject to such modifications as may be required or permitted by Federal statute, regulation, court rule or decision of law.

the addition of Bernstein Litowitz Berger & Grossman, LLP ("Bernstein") and Brower Piven, PC ("Brower Piven") as Co-Lead Counsel in the action. Accordingly, as of 2007, four law firms were approved as Co-Lead Counsel in the Vioxx Class Action MDL: SSB, Milberg, Brower Piven, and Bernstein.[6] Neither Whitehead LLC nor GLS were appointed as Lead or Co-Lead Counsel in the Vioxx Class Action MDL.

The Vioxx Class Action MDL was actively litigated in this Court for several years before it settled in December 2015. See Civil Action No. 05-1151; Civil Action No. 05-2367. Under the December 2015 settlement agreement, Merck agreed to pay $1.062 billion to resolve the claims asserted in the Vioxx Class Action MDL. Def. SUMF ¶ 18.[7] This Court awarded 20% of that settlement amount, approximately $212 million, as attorneys' fees to be divided among eligible counsel for the MDL plaintiffs. Def. SUMF ¶ 19; see Civil Action No. 05-2367, ECF. No. 1057. Pursuant to this Court's February 10, 2016 Order, Special Master Phillips assisted in the allocation of attorneys' fee award, and issued a Report and Recommendation as to his findings. Civil Action No. 05-2367, ECF No. 1012.[8] As Co-Lead Counsel, SSB was awarded $31 million

---

[6] A draft agreement between Milberg and SSB that was circulated between the parties, dated October 13, 2006, set forth a 60% to 40% split of the workload and fees to be collected between Milberg and SSB, respectively. See ECF No. 57-20, Ex. 17 (Non-sequential string of email chains among various parties, spanning from 2003 - 2016) ("Ex. 17, 2003 – 2016 emails"). This draft agreement further provided that GLS and Whitehead's fees would be paid out of SSB's 40% share. This agreement was indisputably drafted before this Court appointed the four firms listed above as co-lead counsel.

[7] On February 10, 2016, this Court entered an Order preliminarily approving the proposed settlement. See Civil Action No. 05-2367, ECF No. 951. The same day, the Court appointed former United States District Judge Layn R. Phillips as Special Master ("Special Master Phillips") to determine all issues relating to the award of attorneys' fees and reimbursement of litigation expenses to Plaintiffs' counsel. Id. at ECF No. 952. On June 28, 2016, this Court entered an Order and Judgment which gave full and final approval to the class action settlement. See id. at ECF No. 1039.

[8] On October 31, 2016, this Court entered an Order clarifying the Special Master's role, and stating, in pertinent part:
> This Court has reviewed the Appointment Order and the submissions by the parties, and concludes that it was never the Court's intent to have the Special Master give a report and recommendation with regard to contractual disputes between law firms relating to forwarding fees. The Appointment Order does not submit such issues to the Special Master.

in attorneys' fees from the common fund. Id. at ECF No. 1067. The Court awarded Whitehead a $550,000 attorneys' fee, and it awarded GLS a $450,000 attorneys' fee. Def. SUMF ¶ 22. The Court additionally entered orders awarding both firms certain litigation expenses. See Civil Action No. 05-2367, ECF Nos. 1068, 1071. One of these Orders, entered December 7, 2016, expressly stated that these awarded amounts were separate from Whitehead's contractual claim for referral fees against SSB. Id. at ECF No. 1071.

### B. THE INSTANT BREACH OF CONTRACT ACTION

Plaintiffs filed this breach of contract action in Louisiana state court on November 2, 2016. Plaintiffs claim that they are entitled to either: (i) 28% of SSB's fee award (14% to each Plaintiff); or (ii) if SSB denies the "72/28 arrangement," a full 50% of SSB's fee award (25% to each Plaintiff). Def. SUMF ¶ 29.

In their Complaint, Plaintiffs allege that Jules Brody of SSB "agreed orally and in writing with [Plaintiffs] to provide the joint representation of clients" in the Pringle Case. According to Plaintiffs, the alleged agreement called for Plaintiffs to receive, "among other things, a percentage recovery, out of SSB's gross fee, to be divided between Whitehead and GLS," i.e., a "referral fee." Id. ¶ 32. Plaintiffs further allege that their original client, Frank Pringle, "approved and agreed to SSB's entry" as counsel in the Pringle Case and to "the division of fees between counsel." Id. ¶ 33.

On December 29, 2016, SSB removed the Louisiana state court action to the United States District Court for the Eastern District of Louisiana based on diversity jurisdiction. Id. ¶ 37. By Order dated June 23, 2017, United States District Judge Sarah S. Vance granted SSB's Motion to Transfer, and this action was transferred to this Court pursuant to 28 U.S.C. § 1404(a).

---

Civil Action No. 05-2367, ECF No. 1066.

<u>See</u> Case No. 17-4704, ECF No. 23. In analyzing the propriety of transfer, Judge Vance

expressly recognized that the alleged agreement was performed primarily here, in New Jersey,

stating:

> [w]hile it is undisputed that the contract was not negotiated or executed in New
> Jersey, the Court finds that a substantial part of the events giving rise to plaintiffs'
> claims occurred there. The contract at issue was not simply a fee-sharing
> agreement, but an agreement to provide joint legal representation.[9] **Although the
> case covered by the agreement was being litigated in New Orleans when the
> agreement was executed, the representation occurred primarily in New
> Jersey, and therefore the contract was performed primarily in New Jersey.**

ECF No. 23 at 8 (emphasis added). Judge Vance also recognized that "New Jersey has an interest

in the resolution of disputes arising from settlements entered and overseen by New Jersey

courts," and that New Jersey law may control this dispute because the work was primarily

performed here, in New Jersey. <u>Id.</u> at 16-17.

On August 21, 2018, SSB filed a motion for summary judgment to dismiss Plaintiff's

Complaint with prejudice. In support of its motion for summary judgment, SSB argues that the

undisputed facts demonstrate that: (1) Plaintiffs' contract claim fails as a matter of law for non-

compliance with Rule 1.5(e); (2) Plaintiffs' alleged agreement was mooted and rendered

unenforceable by developments in the Vioxx Class Action MDL; (3) New Jersey law is

applicable to this matter and provides no basis for a breach of joint venture claim; (4) assuming

arguendo that Louisiana law applies, that Plaintiffs nevertheless fail to state a cause of action for

breach of a joint venture; and (5) any alleged quantum meruit claim Plaintiffs may have had,

which they failed to previously assert, was resolved through the fee allocation process conducted

---

[9] While Judge Vance stated that "[t]he contract at issue was not simply a fee-sharing agreement, but an agreement to
provide joint legal representation," this characterization was clearly based solely upon the allegations plead in
Plaintiffs' Complaint. Subsequent submissions by Plaintiffs make it abundantly clear that their claim is in fact based
upon a fee-sharing agreement, and, as explained in-depth below, it does not fall within any provision of New
Jersey's Rules of Professional Conduct which would legitimize such a fee-sharing relationship.

by this Court following the 2015 settlement of the Vioxx MDL litigation. <u>See</u> ECF No. 53.

Plaintiffs oppose this motion, and argue that summary judgment is inappropriate as: (1) factual

issues abound; (2) SSB is estopped from denying the existence of an agreement; (3) RPC 1.5(e)

was not in effect at the time the agreement was formed, and even assuming arguendo that RPC

1.5(e) does apply, Plaintiffs have complied with RPC 1.5(e); (4) New Jersey law recognizes that

Plaintiffs have a claim under unjust enrichment and quantum meruit; (5) SSB is a fiduciary to

Plaintiffs and should not be rewarded for its failure to keep and maintain a copy of the

agreement; and (6) while Plaintiffs are entitled to enforce the agreement under the laws of either

New Jersey or Louisiana, Louisiana joint venture law applies because this joint venture was

formed in Louisiana. <u>See</u> ECF No. 57.

## II.    SUMMARY JUDGMENT STANDARD PURSUANT TO RULE 56(A)

Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that

there is no genuine issue as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23

(1986) (construing the similarly worded Rule 56(c), predecessor to the current summary

judgment standard set forth in Rule 56(a)). A factual dispute is genuine if a reasonable jury could

return a verdict for the non-movant, and it is material if, under the substantive law, it would

affect the outcome of the suit. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). In the

summary judgment context, "inferences to be drawn from the underlying facts must be viewed in

the light most favorable to the opposing party." <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>

<u>Corp.</u>, 475 U.S. 574, 587 (1986).  The court may not make credibility determinations or engage

in any weighing of the evidence. <u>Anderson</u>, 477 U.S. at 255; <u>see also</u> <u>Marino v. Indus. Crating</u>

<u>Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004) (holding same).

The showing required to satisfy Rule 56(a)'s standard depends on whether the moving party or the non-moving party bears the burden of proof at trial as to the claim or issue in question. When the party moving for summary judgment has the burden of proof at trial, "that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set out specific facts showing a genuine issue for trial"). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001).

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Katz v. Aetna Cas. & Sur. Co.</u>, 972 F.2d 53, 55 (3d Cir. 1992) (quoting <u>Celotex</u>, 477 U.S. at 322-23).

III.    **DISCUSSION**

This case centers on the alleged existence of a referral fee agreement between Plaintiffs and SSB. The Court's jurisdiction in this matter is predicated on diversity of the parties. Accordingly, this Court must first determine which state's choice-of-law rules should be applied in this inquiry. Second, this Court must apply those choice-of-law rules to decide which state's substantive law should determine issues of contract enforceability.

A.    **CHOICE OF LAW ANALYSIS**

"In an action based on diversity of citizenship, a federal court generally applies the choice-of-law rules of the jurisdiction in which it sits." <u>Amica Mut. Ins. Co. v. Fogel</u>, 656 F.3d 167, 170 (3d Cir. 2011). However, faced with a choice-of-law question, federal courts in the district to which the case has been transferred under § 1404(a) must apply the law of the transferor state. <u>Lafferty v. Gito St. Riel</u>, 495 F.3d 72, 76 (3d Cir. 2007) (citing <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 639 (1964)).

This matter was originally filed as a breach of contract action in Louisiana state court, and then removed to the United States District Court for the Eastern District of Louisiana. Following removal, this matter was transferred to the District of New Jersey pursuant to 28 U.S.C. § 1404(a). Therefore, this Court will apply Louisiana's choice-of-law rules. However,

this does not mean that this Court must automatically apply Louisiana substantive law in this dispute. Instead, it means that this Court must apply Louisiana's choice-of-law rules to determine which state's substantive law to apply. See Amica Mut. Ins. Co., 656 F.3d at 171.

The parties dispute whether New Jersey or Louisiana state law governs Plaintiffs' claims. While SSB contends that New Jersey state law should apply as New Jersey bears the most significant connection to and interest in the resolution of this litigation, Plaintiffs argue that they are entitled to enforce the contract under either New Jersey or Louisiana state law. However, in the alternative, Plaintiffs additionally claim that, should the Court find the agreement unenforceable under New Jersey state law, they are entitled to argue its validity under Louisiana's "far stronger" joint venture law. ECF No. 57 at 19-21.

The conflict of law analysis regarding contracts is codified in Louisiana Civil Code Articles 3515 and 3537. See Premium Hosp., L.L.C. v. Astra Capital Funding, No. 12-0779, 2013 U.S. Dist. LEXIS 101217, at *24 (E.D. La. July 19, 2013).

> Article 3515 provides, in pertinent part, that 'an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.' La. Civ. Code art. 3515. The article further provides two factors which the court must consider:
>
> > (1) the relationship of each state to the parties and the dispute; and
> >
> > (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

Cohen v. Becker, No. 17-935, 2018 U.S. Dist. LEXIS 20804, at *11-12 (E.D. La. Feb. 8, 2018).

Louisiana Civil Code article 3537 further provides a choice of law provision when the issue involves conventional obligations and contracts, and states that the Court must additionally consider 3 factors, as follows:

**an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.**

>    That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

La. Civ. Code art. 3537 (emphasis added). Accordingly,

>    [a]s articulated by the Fifth Circuit, the Louisiana's Civil Code requires that, in sequence, a court must "(1) examine the pertinent contacts of each state with respect to 'the particular issue as to which there exists an actual conflict of laws', (2) identify the various state policies that might be implicated in the choice of law, and then (3) evaluate the 'strength and pertinence of these policies in light of "the relationship of each state to the parties and the dispute,"' and in light of 'the policies and needs of the interstate and international systems' . . . ."

VFS US LLC v. Vaczilla Trucking, LLC, No. 15-02226, 2015 U.S. Dist. LEXIS 154560, at *21-22 (E.D. La. Nov. 13, 2015) (citing Marchesani v. Pellerin-Milnor Corp., 269 F.3d 481, 487 (5th Cir. 2001)).

Louisiana Article 3537 also requires courts to consider "the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other." Article 3515 states that a court should determine the strength and pertinence of states' policies in light of:

>          (1) the relationship of each state to the parties and the dispute; and
>          (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

La. Civ. Code art. 3515.

While the Pringle case was initially instituted in Louisiana, the vast majority of litigation in the underlying matter occurred in New Jersey, where the case was litigated for approximately ten years before a settlement was reached. Moreover, after the consolidated Vioxx litigation was transferred to this Court, the parties agreed to be bound by the New Jersey ethical rules upon their admission *pro hac vice*. New Jersey has a strong interest in enforcing its' ethical rules, particularly in regards to attorney compensation. Therefore, New Jersey has the "more significant relationship" with the transaction, and these contacts weigh overwhelmingly in favor of applying New Jersey substantive law— particularly its ethical strictures on compensation of attorneys. The Court notes, again, that Plaintiffs have not come forward to allege any connection Louisiana has to this dispute, or interest that would be substantially harmed by failing to apply its laws, except that one of the Plaintiffs is a citizen of Louisiana, the client, Pringle, is a citizen of Louisiana, and that the original suit was filed in Louisiana. Therefore, for all the above-mentioned reasons, the Court finds that New Jersey ethical rules governs Plaintiffs' claims in this matter.[10]

## B. RULE 1.5(E) & ENFORCEABILITY OF THE ALLEGED REFERRAL FEE AGREEMENT

According to their Complaint, Plaintiffs claim that they are owed twenty-eight percent of SSB's $31 million-dollar fee award under an alleged referral fee arrangement. This Court disagrees.

As discussed above, "[u]nder the local rules of this court, the American Bar Association's Model Rules of Professional Conduct ("RPC"), as modified and adopted by the New Jersey

---

[10] The parties have not identified any conflict between New Jersey law and Louisiana law as to its substantive law of contract, and the Court will therefore apply the forum's law. As to contentions covering joint venture agreements, the Court will apply New Jersey ethical rules as described <u>infra</u>, and need not resolve whose substantive law applies.

Supreme Court, govern the ethical conduct of attorneys in this Court." <u>Maldonado v. New Jersey</u>, 225 F.R.D. 120, 137 n.13 (D.N.J. 2004). "In interpreting the RPCs, the Court looks to New Jersey's state courts' interpretations as primary authority and modifies that interpretation when required or permitted by federal law." <u>Strategic Envtl. Partners, LLC v. Bucco</u>, Civil Action No. 13-5032, 2014 U.S. Dist. LEXIS 159483, at *6 (D.N.J. Nov. 12, 2014) (citing L. Civ. R. 103.1(a); <u>Steel v. GMC</u>, 912 F. Supp. 724 (D.N.J. 1995)).

New Jersey Rule of Professional Conduct ("RPC") 1.5(e) governs the propriety of attorney fee arrangements and fee-splitting among attorneys who do not work at the same firm. RPC 1.5(e) provides, as follows:

> (e) Except as otherwise provided by the Court Rules, a division of fee between lawyers who are not in the same firm may be made only if:
> (1) the division is in proportion to the services performed by each lawyer, or, by written agreement with the client, each lawyer assumes joint responsibility for the representation; and
> (2) the client is notified of the fee division; and
> (3) the client consents to the participation of all the lawyers involved; and
> (4) the total fee is reasonable.

N.J. Court Rules, RPC 1.5(e).[11] Thus, the New Jersey RPCs essentially forbid fee-splitting or referral fees except in two circumstances: the first in circumstances where the division of fees is in proportion to the work performed by each attorney, the client is informed and consents to the participation of all the lawyers involved, and the total fee is reasonable; and the second in circumstances where by written agreement with the client, each lawyer assumes joint responsibility for the representation, the client is informed and consents to the participation of all the lawyers involved, and the total fee is reasonable.

---

[11] The Court notes that although <u>R.</u> 1:39-7(d) permits a referral fee to be divided without regard to services performed when a certified attorney receives a case referral, this Rule is not applicable in the instant matter as neither Plaintiffs nor Defendant Brody of SSB are certified civil attorneys in the State of New Jersey.

There is no contention by Plaintiffs that the division allegedly agreed to is in proportion to the services provided by each participant. Thus, the first exception clearly does not apply. Plaintiffs instead assert that their alleged agreement falls under the second exception. Their argument is predicated upon a certification submitted by their client Pringle. This certification asserts the following:

> I retained C. Mark Whitehead as my attorney for legal representation in regard to the securities claims against Merck arising out of matters related to Vioxx. See Compliant attached hereto as Exhibit A.

> On or about November 20, 2003, Mr. Whitehead notified me that he, C. Mark Whitehead, Shelly A. Sanford and Carlene Lewis of Goforth, Lewis and Sanford had associated New York law firm, Stull, Stull & Brody as co-counsel and would be sharing amongst themselves the legal fees earned in the case. Mr. Whitehead informed me that my interests in the litigation would not be diminished by the attorneys' arrangement, rather, the agreement between Whitehead, Goforth, Lewis and Sanford and Stull, Stull & Brody was simply an allocation of legal fees amongst the law firms working on my behalf.

> I willingly consented to this arrangement because it did not diminish my financial interest and I believed the legal fee being paid to Whitehead, Sanford & Stull, Stull & Brody was reasonable.

ECF. No. 57, at Ex. 8 (Aff. of Frank E. Pringle, dated Sept. 8, 2018) ("Pringle Aff.")).

Even a cursory review of this certification discloses that there has been virtually no compliance with the requirements for this second exception to Rule 1.5(e) to apply. As discussed above, because our District Court Rules incorporate the New Jersey State Rules in total, each of the individual attorneys seeking admission— Mark Whitehead, Shelly Sanford, and Jules Brody— agreed to be bound by and to conduct themselves in conformance with the ethical provisions of the RPCs in New Jersey, pursuant to the Court's Orders granting their admission *pro hac vice.* However, in violation of RPC 1.5(e), there is no indication, *in writing* or otherwise, that Pringle agreed to, or was even aware of, the referral fee agreement or proceeds among counsel. Pringle's September 8, 2018 affidavit, filed in support of the breach of contract claim,

and not as part of the underlying Vioxx litigation, makes no references to a referral fee amount, or to the division of labor or responsibilities among co-counsel. It merely provides that: (1) Pringle was made aware by Whitehead in 2003 that Plaintiffs had associated with SSB as co-counsel, who would be "sharing amongst themselves the legal fees earned in the case;" (2) that his interests would not be diminished in the litigation as a result; and (3) that the agreement between Plaintiffs and SSB "was simply an allocation of legal fees amongst the law firms working on [his] behalf." ECF. No. 57, at Ex. 8 (Pringle Aff.).

Pringle's affidavit fails to provide any further details with respect to being notified of the association between SSB and Plaintiffs approximately fifteen years prior, and provides no indication that by "**written agreement with the client** each lawyer assumes joint responsibility for the representation." (emphasis added). Nor does the affidavit indicate that he was advised what the division supposedly was. This is not surprising inasmuch as Plaintiffs are still asserting inconsistent versions of what the alleged deal was. Thus, there is no genuine dispute that Plaintiffs failed to satisfy the requirements of RPC 1.5(e) by neglecting to fully notify their client regarding the parameters of the fee arrangement in this case. Furthermore, even if RPC 1.5(e) does not require proof of services performed in obtaining a referral fee, its previously addressed conditions must be satisfied to create a valid fee agreement.

The obligations which Plaintiffs Whitehead and Sanford assumed on agreement to be admitted *pro hac vice* in this Court, are quite similar to the obligations which an attorney admitted *pro hac vice* agrees to in connection with limiting his or her fees in contingent fee matters before this Court. Indeed, our Courts have routinely held that practitioners from other states admitted *pro hac vice* are governed by New Jersey's contingent fee rule. See Halley v. Honeywell Int'l, Inc., 861 F.3d 481, 499 (3d Cir. 2017) (stating "[t]he United States District

Court for the District of New Jersey incorporates Rule 1:21-7's limitations on contingent fees in its Local Rules. Civil Local Rule 101.1(c)(4) provides '[a] lawyer admitted *pro hac vice* is deemed to have agreed to take no fee in any tort case in excess of New Jersey Court Rule 1:21-7 governing contingent fees.'"); [12] Mitzel v. Westinghouse Elec. Corp., 72 F.3d 414, 417-18 (3d Cir. 1995) (stating that "New Jersey law considers that matters relating to attorney's fees fall within the sphere of the state's 'paramount concern with its courts.'"); In re Nutraquest, Inc., Nos. 03-5869 (GEB), 03-44147 (RTL), 2004 U.S. Dist. LEXIS 29146, at *33 (D.N.J. Mar. 15, 2004) (applying Mitzel to deny out-of-state attorneys' request to strike the provision incorporating New Jersey's contingent fee rule, N.J. Ct. R. 1:21-7 from the court's order granting admission *pro hac vice*). Just as the Third Circuit has held that attorneys admitted *pro hac vice* for contingent fee cases are subject to New Jersey's contingency fee rule, likewise, attorneys admitted *pro hac vice* in class-action common funds cases are subject to the New Jersey disciplinary rules upon their admission.

Finally, Plaintiffs contend that the provisions of RPC 1.5(e) were not in existence at the time the alleged agreement was reached. This argument that RPC 1.5(e) is not applicable because it "was not adopted until after the client relationship was formed" is patently incorrect. The problem with Plaintiffs' argument is twofold. First, Rule 1.5(e), as it currently exists, was certainly in effect when Plaintiffs were admitted to this Court *pro hac vice* in 2005. The Note to the Rule makes clear that Rule 1.5(e) was adopted in 1984, and was amended by the New Jersey Supreme Court in 2003 to include subsection (e)(2), requiring that lawyers notify a client of a

---

[12] Indeed, the Third Circuit has stated that "[l]awyers practicing before the District Court are well aware contingent fee agreements will be subject to the limitations of Rule 1:21-7 as incorporated in the Local Rules. **Accordingly, New Jersey Court Rule 1:21-7, incorporated in Civil Local Rule 101.1, acts as a federal procedural rule limiting contingent fee agreements in class actions certified under Federal Rule of Civil Procedure 23 in the District of New Jersey.**" Halley, 861 F.3d at 499 (emphasis added).

division of a fee between lawyers who are not in the same firm.[13] As a result, former

subparagraphs (e)(2), requiring the client to consent to the participation of all the lawyers

involved, and (e)(3), requiring the total fee to be reasonable, were "redesignated as

subparagraphs (e)(3) and (e)(4)." Since the RPC's adoption in 1984, it has been a requirement

that fee division is only permitted where the division is in proportion to the services performed

by each attorney, or, by written agreement with the client, each lawyer assumes joint

responsibility for the representation.[14] The only difference between the pre-2004 version of the

Rule and the Rule as it is currently drafted is the addition of subdivision (e)(2), which required

client notification of the fee division. Even under the prior version of the Rule, Plaintiffs do not

qualify for either of the exceptions to Rule 1.5(e) because, as discussed above, the provision of

subdivision (e)(1), requiring a written agreement with the client under which each lawyer

assumes joint responsibility, simply was not met. Plaintiffs have not presented any written

agreement or contended that any such written agreement exists. Nor have there been any

contentions that there was an agreement with the client that each of the attorneys would assume

joint responsibility. Accordingly, Plaintiffs are unable to show compliance with Rule 1.5(e).

Because the alleged agreement does not comply with Rule 1.5(e) of the Rules of Professional

---

[13] While the Rule was amended on November 17, 2003, the amendment became effective on January 1, 2004.

[14] See 1983 Report of the Debevoise Committee Recommending Adoption of the RPCs in New Jersey. (stating that "Model Rule 1.5(e) deals with the practice of fee splitting. Under this paragraph as written, no fee division would be permitted unless three preconditions have all been satisfied: (1) the division is in proportion to the services performed by each lawyer, or by written agreement with the client each lawyer assumes joint responsibility for the representation, and (2) the client consents to the participation of all the lawyers involved, and (3) the total fee is reasonable."). The 1984 New Jersey Supreme Court Adoption of the Rules of Professional Conduct adopted Rule 1.5(e) exactly as recommended by the Debevoise Committee.

Conduct, enforcement of the agreement would be against public policy, and it cannot be a basis of recovery for Plaintiffs.[15]

### C. PLAINTIFFS HAVE FAILED TO SHOW THE EXISTENCE OF A VIABLE CONTRACT

Even if Plaintiffs' efforts to enforce the alleged agreement were not barred by the New Jersey ethical rules, the Court is satisfied that Plaintiffs have failed to adequately demonstrate, for purposes of Rule 56(a), that an otherwise enforceable referral fee contract existed. The Court notes that SSB has unequivocally denied that such an agreement exists, and Plaintiffs bear the burden of going forward with evidence which demonstrates a triable and material issue of contested fact as to the existence and terms of such an agreement. As discussed below, Plaintiffs have failed to meet their burden.

"Although courts are to resolve any doubts as to the existence of genuine issues of fact against the parties moving for summary judgment, Rule 56(e) does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegations or suspicions." Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). "[A] mere 'scintilla of evidence,' without more, will not give rise to a genuine dispute for trial." Kasilag v. Hartford Inv. Fin. Servs., No. 11-1083, 2016 U.S. Dist. LEXIS 47063, at *24 (D.N.J. Mar. 24, 2016) (quoting Anderson, 477 U.S. at 252). It is undisputed that, to date, a copy of the alleged referral fee contract has not been produced. SSB asserts that "both parties acknowledge there was an agreement yet disagree as to its terms," and contends that "the parties agreed at the outset of the Pringle Case that each of them would be compensated based on the amount of time they actually spent on the case, as

---

[15] Plaintiffs argue that even where an agreement has violated the New Jersey ethical rules, New Jersey Courts have not uniformly barred recovery. The problem with Plaintiffs' argument is that in these circumstances, New Jersey courts have only authorized recovery under a quantum meruit analysis. See Goldberger, Seligsohn & Shinrod, P.A. v. Baumgarten, 875 A. 2d 958, 964 (App. Div. 2005). Here, Plaintiffs have already received, through a judicial determination, a quantum meruit recovery for work performed in the underlying litigation and for their contributions to the case. Plaintiffs fail to present any evidence for the Court to revise its prior determination, which allocated reasonable compensation to Plaintiffs for services rendered.

determined by the court overseeing the allocation of a common attorneys' fee fund." ECF No. 58 at 12. Plaintiff Whitehead states that his copy of the referral fee agreement was allegedly lost during Hurricane Katrina, while Plaintiff Sanford states that she has been unable to locate a copy following the death of her law firm partner, Carlene Lewis, who allegedly negotiated and kept possession of the agreement.[16] However, no clear or credible explanations have been provided to the Court for the shifting recollections of the parties as to the amount allegedly owed as a referral fee. Nor has any extrinsic evidence been produced that actually points to the alleged terms of such written or oral contract.

Plaintiffs have simply failed to meet their obligation to go above a mere scintilla of evidence in support of the existence of the alleged agreement or its terms. Nowhere in any of Plaintiffs' certifications do they actually certify that there was a conversation or written agreement with a specific individual in which the terms of this alleged contract were agreed upon. Instead, the certifications merely include conclusory language about the alleged terms. Notably, neither of the two key Plaintiff parties state that they ever had a face-to-face or telephone conversation with anyone from SSB in which fee-splitting or a referral fee was agreed upon. Nor do either of the two Plaintiffs certify that there was ever an email exchange in which it was agreed that the fees would be split. Instead, Plaintiffs merely direct the Court to an email exchange *by and between the Plaintiffs*, *and not between Plaintiffs and any Defendants or any member of SSB*, where such a fee split was discussed. See ECF No. 57-20, (Ex. 17, 2003 – 2016 emails). Moreover, neither party ever certified that they actually signed an agreement with specific terms or received an agreement with specific terms. All that Plaintiff Sanford certified was that:

---

[16] See ECF No. 57-31 at 3 (Ex. 25, Aff. of Shelly Sanford); Id. at 7 (Ex. 26, Cert. of Mark Whitehead).

5. Along with Mark Whitehead, we negotiated an agreement with Jules Brody, the owner of Stull, Stull & Brody that we would be compensated for our time, through the common benefit fund and would be paid a referral fee of 28% of the gross recovery in the case. This fee would be split 14% to GLS and 14% to Mark Whitehead. At that time, my law partner, Carlene Lewis, was responsible for not only negotiating the fee, but also with the execution and retention of the agreement. That agreement was negotiated and signed. At that time, email was not commonly used by Jules Brody and our communications over the years were primarily by telephone, facsimile, overnight delivery services, or through others in his firm who used email.

. . . .

9. When it became clear that SSB was not going to honor the referral fee agreement, I submitted an affidavit, with my best recollection of the terms of the agreement, to [Special Master] Phillips. I knew the agreement provided GLS with at least a 10% referral fee. Since that time, I have provided one of the computers we used at GLS during the time in question to my counsel. From that computer, we were able to recover the documents marked in this litigation as P0148-P0149; P0164; P0309; P0311-P0319. These documents make clear the terms of the referral arrangement are the 28% described above.

ECF No. 57-31 at 3-4 (Ex. 25, Aff. of Shelly Sanford).

Similarly, Plaintiff Whitehead only certified that:

7. . . . Shelly Sanford and Carlene Lewis and I **expected a referral fee from the law firm we selected as securities counsel. Stull, Stull & Brody agreed to these conditions and encouraged our continued involvement throughout the litigation.**

8. I specifically recall having a signed fee agreement faxed to me and Ms. Sanford by Stull, Stull & Brody. Our records were destroyed during Hurricane Katrina and I cannot locate that agreement.[17]

Id. at 7 (Ex. 26, Cert. of Mark Whitehead) (emphasis added).

Furthermore, despite Plaintiff Sanford's claim that the documents labeled P0148-P0149, P0164, P0309, and P0311-P0319 "make clear the terms of the referral agreement," review of these documents reveals this statement to be incorrect. The documents marked P0311 to P0319

---

[17] Plaintiff Whitehead's certification does not, however, contain any statement as to his recollection of the terms of this agreement— or what the fee division was.

are in fact copies of an October 13, 2006 email from Mark Levine of SSB to Plaintiffs which attached an unsigned draft agreement, also dated October 13, 2006, between Milberg and SSB that was circulated between the parties, setting forth a 60% to 40% split of the workload and fees to be collected between Milberg and SSB, respectively. See ECF No. 57-20 at 6-14 (Ex. 17, 2003 – 2016 emails). This draft agreement further provided that GLS and Whitehead's fees would be paid out of SSB's 40% share. No information regarding any type of referral fee is provided.

Next, the documents marked P0148 to P0149 are in fact a copy of a November 12, 2003 email allegedly setting forth a proposed agreement between GLS, Lambert & Nelson,[18] and SSB. However, review of the first email reveals it was sent from Plaintiff Sanford to Lambert & Nelson, Plaintiff Whitehead, and Carlene Lewis, Plaintiff's former law partner. Nowhere is there any evidence that this alleged agreement was actually circulated to SSB. Review of the second email reveals it was sent solely from Plaintiff Sanford to her law partner Carlene Lewis. Moreover, both of these emails additionally provide that the attorneys' fees are to be divided so that "25 percent of 100 percent of the gross fees [go] to GLS and [Lambert & Nelson] (12.5% each)." ECF No. 57-20 at 15-16 (Ex. 17, 2003 – 2016 emails).

Similarly, the document marked P0164 is a copy of two emails dated February 20, 2004, and one email February 23, 2004. However, careful scrutiny of these emails shows that the original email, dated February 20, 2004, originated from Sharon Lee of Milberg, and was sent to SSB and Plaintiff Whitehead, attaching a draft version of a stipulation for the parties' review. That same day, Whitehead forwarded this email to Plaintiff Sanford and Carlene Lewis, and added a message stating "[e]nclosed is the proposed stipulation with Milberg. Your 14%

---

[18] The Court notes that the firm Lambert & Nelson is not mentioned anywhere within the relevant submissions to the Court. At oral argument, the parties advised that Lambert & Nelson was Plaintiff Whitehead's former firm.

percentage with Jules will be intact. I recognize that your name does not appear on this stipulation – they are afraid a multi-tiered structure will make the judge leery of this proposal. . . ." ECF No. 57-20 at 17 (Ex. 17, 2003 – 2016 emails). The next email, dated February 23, 2004, was sent from Plaintiff Sanford to Whitehead, and states "[l]ooks fine Mark except that we would not like to be deleted from the pleadings in the case." Id. Thus, while the original email that began this exchange was from Milberg to SSB and Whitehead, nowhere is there any evidence that the second email, also dated February 20, 2004, and which references this alleged 14% referral fee, *was actually circulated to or agreed upon by SSB*. Instead, this conversation once again occurs only among Plaintiffs, and there is no evidence to suggest either SSB or Milberg was copied on the part of the conversation that Plaintiffs appear to rely on.

Finally, the document marked P0164 is a copy of a September 7, 2006 email sent from Plaintiff Sanford to herself, appearing to memorialize a conversation whose participants are unclear, and which provides, in part: "Mark conversation with Jules. 28 percent of 50; percent; if it gets diminished he will make it up to us because of a deal he may cut with Brower." ECF No. 57-20 at 18 (Ex. 17, 2003 – 2016 emails). This document reveals nothing more than an email sent by Plaintiff Sanford to herself, possibly recounting a conversation or some discussion that occurred *between Plaintiff Whitehead and Jules Brody*. Once again, the contents of this email provide no supportable evidence of any alleged agreement or communication with SSB or the terms of any such agreement.

Review of the documents highlighted by Plaintiff Sanford reveal precious little evidence of any agreement, written or otherwise, let alone making it clear that "the terms of the referral arrangement are the 28% described above" as Plaintiff Sanford certified. Most remarkably, the very certifications to this Court and to the Special Master contain approximately four separate

variations of what the alleged agreement was. Thus, not only is there little to no extrinsic evidence to support the existence of the agreement itself, or any terms of the alleged agreement, but there exists a significant lack of consistency with regard to the amount of the referral fee allegedly owed to Plaintiffs for referring the Pringle case to SSB. The record reflects that besides the 12.5% referral fee to each GLS and Whitehead allegedly agreed to in 2004 and pointed to by Plaintiff Sanford, an August 26, 2016 application by Whitehead to Special Master Phillips stated the referral fee owed to Whitehead and GLS was 10% of SSB's gross award, with 5% going to each firm. See ECF No. 50-2, Ex. 1 (Decl. of Jules Brody), at Ex. E (Submission of Whitehead Law Firm to Special Master Phillips). However, a subsequent submission by GLS to Special Master Phillips asserted that the referral fee owed to GLS was actually 10%, and not 5% as stated by Whitehead. See ECF No. 50-2, Ex. 1 (Decl. of Jules Brody), at Ex. F (Submission of GLS to Special Master Phillips). Both of these applications were submitted as part of the fee allocation process in the underlying Vioxx litigation. In contrast to the alleged 2004 agreement and the 2016 submissions to Special Master Phillips, Plaintiffs' Complaint in the instant breach of contract action sets forth an entirely different amount allegedly owed; Plaintiffs now contend that the referral fee owed to them by SSB is actually 28%, with 14% allocated to each Whitehead and Sanford. Thus, Plaintiffs have inexplicably provided at least four different varying amounts allegedly owed to them by SSB as a referral fee. The Court finds that the evidence submitted in support of the existence of this alleged contract and its terms is purely conclusory. Although Plaintiffs state they signed an agreement entitling them to a referral fee, Plaintiffs have failed to provide sufficient information for a trier of fact to determine what it is they actually signed. In the absence of a written agreement memorializing the terms of the alleged agreement, parole evidence as to an oral agreement about its terms might be sufficient. Thus, a certification that one

of the Plaintiffs had a conversation with Defendant Brody that a particular division of fees was agreed upon, might very well suffice—but there is none. Here, there is simply no parole evidence that is presented to establish sufficiently definite terms or that such agreement was actually reached.[19]

Finally, the Court recognizes that where there is legally sufficient evidence to support a claim, a Court is not permitted, on a summary judgment motion, to engage in any weighing of the evidence. The problem for Plaintiffs is that there is no evidence to weigh in this case. Therefore, the evidence proffered by Plaintiffs is insufficient to rise above the "mere scintilla" standard necessary for surviving summary judgment. See Jackson v. Danberg, 594 F.3d 210, 226-27 (3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs., 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat a motion for summary judgment.")). Accordingly, even viewed in the light most favorably to the non-moving party, Plaintiffs have failed to demonstrate a material issue of fact exists sufficient to defeat SSB's motion for summary judgment.

---

[19] As a fallback position, Plaintiffs contend that "if however the Court were to find that the agreement is not sufficiently specific to enforce under New Jersey law, then Shelly [Sanford] and Mark [Whitehead] are entitled to argue the strong joint venture law of Louisiana because Louisiana's joint venture law is far stronger than that of New Jersey's." ECF No. 57 at 25-26. Defendant contends that neither New Jersey nor Louisiana joint venture law would warrant a recovery here. The Court need not delve into the mysteries of New Jersey and Louisiana joint venture law to deal with this issue because, any recovery under a joint venture agreement would still run afoul of RPC 1.5(e). In short, no matter how Plaintiffs choose to characterize this agreement, whether as a joint venture, a special partnership, or a contract, any recovery based upon a fee splitting arrangement must comply with New Jersey ethical requirements— just as Plaintiffs agreed to when they sought *pro hac vice* admission to this Court. Legal sleight of hand will not alter the underlying fact that the arrangement is not cognizable under New Jersey public policy. Unfortunately for Plaintiffs, their noncompliance with RPC 1.5(e), as determined above, bars recovery under this theory as well.

**IV.** **CONCLUSION**

For the foregoing reasons, the Court grants SSB's motion for summary judgment. An appropriate Order will be filed.

    s/ Stanley R. Chesler   
STANLEY R. CHESLER
United States District Judge

Dated: March 5, 2019